Filed 1/21/14  In re N.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re N.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>S.B.,<br><br>　　　　Defendant and Appellant. | E058754<br><br>(Super.Ct.Nos. J239121 & J239122 & J239123 & J248136)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey and Gregory S. Tavill, Judges.  Affirmed in part; reversed in part.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

1

The juvenile court terminated S.B.'s (Mother) parental rights to three of her four children, N.P.J., N.P., and A.P. The juvenile court found Mother's fourth child, J.C., who was born while the dependency case involving the three older children was pending, came within the court's jurisdiction. In regard to J.C.'s case, Mother contends (1) substantial evidence does not support the juvenile court's jurisdictional findings; (2) the juvenile court erred by relying on uncorroborated hearsay evidence in finding Mother engaged in violent behavior; and (3) the juvenile court erred by not considering Mother's request for a new social worker (Welf. & Inst. Code, § 16513.5).[1]

As to the case involving the three older children, Mother contends (1) the juvenile court erred by denying her request to change a court order (§ 388); and (2) the court should have applied the parent-child bond exception to terminating parental rights (§ 366.26, subd. (c)(1)(B)(i)). In regard to both cases, or all four children, Mother asserts Judge Kersey was not objective and should have recused herself. We reverse the jurisdictional order as it relates to Mother and J.C., but otherwise affirm the judgment.[2]

### FACTUAL AND PROCEDURAL HISTORY

A.      DETENTION OF THE THREE OLDER CHILDREN

In 2011, Mother had three children: (1) A.P., a female born in 2007; (2) N.P., a female born in 2008; and (3) N.P.J., a male born in 2010. A.P.'s alleged father was

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother has filed a petition for writ of habeas corpus in connection with this case. We dispose of the writ by separate order.

2

R.R. R.R. was not listed on A.P.'s birth certificate, he had never visited A.P., and had not provided financial support for A.P. N.P. and N.P.J.'s presumed father was N.P.S. N.P.S. was on N.P.'s and N.P.J.'s birth certificates and he held the two children out as his own. B.W. was the children's maternal great-grandmother (Great-Grandmother). A.W. (Grandmother) was the children's maternal grandmother. Mother had two brothers, D.B. and M.K. Mother and her brothers were wards of the dependency court during the 1990s.

A.P. was removed from Mother's custody in 2007 and placed in the custody of Great-Grandmother. Great-Grandmother petitioned the probate court for legal guardianship of A.P. The probate court granted Great-Grandmother temporary guardianship while the matter was continued for a hearing in June 2011. A social worker from San Bernardino County Children and Family Services (the Department) visited Great-Grandmother's house and found A.P. was alone with Mother's 21-year old brother, D.B., who had a criminal history. Early in 2011, at Great-Grandmother's house, D.B. was arrested for battery with serious bodily injury (Pen. Code, § 243, subd. (d)) in an incident involving Grandmother. A.P. was in the home at the time of the battery.

In 2009, the Department received a referral alleging D.B. sexually abused his half-brother, M.K., who was six years old. M.K. told a social worker that D.B. "'put his dick inside my mouth,'" and threatened to "slit [M.K.'s] throat" if he told anyone about the abuse. Great-Grandmother said she "had 'suspicions'" about the abuse taking place, but denied actual knowledge. A.P. was taken into protective custody.

Mother left N.P.J. and N.P. in Grandmother's care. During a probation search of Grandmother's house, a deputy found two methamphetamine pipes with residue on the floor; one of the pipes was next to a child's toy. A bag of marijuana was next to over-the-counter medications. Rat traps were on tables and dressers, bug poisons were next to the children's medicine, and rotting food was "in [the] open." Grandmother's house did not have hot water for a month, gas fixtures were exposed, and electrical outlets were "open." Grandmother and Mother were arrested for child endangerment. (Pen. Code, § 273a, subd. (a).) N.P.J. and N.P. were taken into protective custody. The three children were placed together in a foster home.

On May 26, 2011, the Department filed a petition alleging Mother failed to protect the children (1) by leaving N.P. and N.P.J. in the care of Grandmother, who was a known drug abuser; (2) by leaving N.P. and N.P.J. in a home where drugs and drug paraphernalia were within the children's reach; (3) by leaving A.P. in a home with D.B., who had a criminal history involving domestic violence and possibly child molestation; (4) because Great-Grandmother allowed D.B. to be in the home with A.P. despite his criminal history; (5) because A.P. remained out of Mother's custody for 18 months, due to Mother's substance abuse; (6) because Mother suffered from drug addiction, which impaired her judgment; (7) because N.P.S. suffered from drug addiction, which impaired his judgment; (8) because N.P.S. had a criminal history, which demonstrated his lifestyle was not conducive to caring for children; (9) R.R. suffered from drug addiction, which impaired his judgment; and (10) R.R. should have known A.P. was at risk of abuse or neglect, but failed to act.

4

Also included in the petition were allegations that Mother, N.P.S., and R.R. left the children without any provision for support. Mother provided no support because she was incarcerated. R.R. and N.P.S. did not provide support because their whereabouts were unknown. The juvenile court found a prima facie case was established and ordered the children continue in their foster placement.

B.    JURISDICTION

Mother admitted she left N.P. and N.P.J. at Grandmother's home the day before they were found at the home. However, Mother blamed the condition of the home on the police raiding it, and claimed it was not in that condition when she left the children there. Mother denied using drugs and said she had been sober for six months. Mother was unaware of the legal guardianship proceedings involving A.P. and Great-Grandmother. Mother also denied knowing D.B. had been accused of sexually molesting their brother, M.K. Great-Grandmother told a Department social worker that D.B. moved out of her house immediately after A.P. was removed. The children were doing well in their foster placement.

The court found true the allegations that Mother failed to protect: (1) N.P. and N.P.J. by leaving them in the care of Grandmother, who was a known drug abuser; (2) N.P. and N.P.J. by leaving them in a home where drugs and drug paraphernalia were within the children's reach; (3) A.P. because the child remained out of Mother's custody for 18 months, due to Mother's substance abuse; and (4) all three children because Mother suffered from drug addiction, which impaired her judgment. The court also

5

found Mother left the children without provisions for support when she was incarcerated.

In regard to the fathers, the court found: (1) N.P.S. suffered from drug addiction, which impaired his judgment; (2) N.P.S. had a criminal history, which demonstrated his lifestyle was not conducive to caring for children; (3) R.R. suffered from drug addiction, which impaired his judgment; (4) R.R. should have known A.P. was at risk of abuse or neglect, but failed to act; and (5) R.R.'s whereabouts were unknown and he left A.P. without provisions for support.

### C.     SIX-MONTH STATUS REVIEW

Mother was living with friends, and had no income. Mother participated in drug treatment, drug testing, individual counseling, and parenting classes. Mother visited with the children for one hour per week. Great-Grandmother, Grandmother, and N.P.S. also visited with the children.

At the beginning of A.P.'s foster care, she displayed "sexualized behaviors." A.P. would approach strangers and asked them to take her home with them. The behaviors lessened as she adjusted to her foster home. The three children appeared to have bonded with their foster parents. The court ordered that the children continue in their foster placement, but increased Mother's visits to two hours per week.

### D.     12-MONTH STATUS REVIEW

Mother was residing with Great-Grandmother. Mother completed her parenting classes and substance abuse treatment. Mother continued to test negative for drugs and participated in 12-step meetings. Mother obtained a job stocking store shelves and was

6

having unsupervised two-hour visits with the children. The juvenile court authorized the Department to return the children to Mother on a family maintenance plan, "by approval packet," when the social worker deemed it appropriate.

E.    18-MONTH STATUS REVIEW

Mother became pregnant with her fourth child, J.C. M.C. was J.C.'s father. M.C. had a criminal history and history of abusing drugs. Mother's car broke down, so she relied on Great-Grandmother for rides. Mother was late to work several times and lost her job. Mother had been unable to find another job. Mother lived with Great-Grandmother. Mother was looking for housing for herself and the children, but had not yet found a residence. Great-Grandmother offered to move out of her house, so Mother could live in the residence with the children.

A different Department social worker was assigned to the children's case. The new social worker (Ashlock) recommended reunification services be terminated. Ashlock noted Mother "technically finished her case plan," was testing negative for drugs, and was participating in classes as part of her criminal case, but Ashlock faulted Mother for not continuing in counseling and not providing the Department with documentation reflecting her attendance at 12-step meetings. Ashlock also faulted Mother for having relatives, such as Great-Grandmother, participate in weekly visits with the children. Due to the relatives attending the visits, Ashlock recommended Mother's visits be supervised.

On November 21, 2012, the juvenile court found Mother failed to make substantive progress in her case plan and terminated her reunification services. The

7

court reduced Mother's visitation with the children to one hour per week of supervised visits. In rendering its ruling the court said, "The mother earlier told the Court she does not have a place to live; she is living with her grandmother. It is her grandmother or the kids' grandmother. I'm not really sure which. She has no job and no prospects in site [*sic*] for three kids, and now, plus one. The Court will set a .26 hearing."

### F.     DETENTION OF J.C.

Mother's fourth child, J.C., was female and was born in February 2013. The Department learned of J.C.'s birth two days after she was born. Mother informed the social worker she had an apartment and infant supplies. The apartment had been leased for Mother by Great-Grandmother. M.C. lived at the apartment and said he had been sober since 2011.

On February 13, the social worker "was informed that [Mother], [M.C.], and [Great-Grandmother] were seen and heard engaging in a verbal altercation in the parking lot of the [Department's] office." A security guard heard the trio "angrily arguing amongst themselves." Great-Grandmother complained that she was not allowed to attend the meeting concerning J.C.'s possible detention, but was expected to drive Mother to the meeting. Great-Grandmother yelled at M.C., "'I know you kicked the dogshit out of her when she was pregnant!'"

The social worker investigated M.C.'s criminal history. M.C. was arrested for domestic violence (Pen. Code, § 243, subd. (e)(1)) on October 16, 2012. The incident involved Mother, and resulted in Mother and M.C. suffering injuries. M.C. was also arrested on December 26, 2012, for being under the influence of a controlled substance.

8

M.C. tested positive for methamphetamine and marijuana. The Department detained J.C.

On February 19, 2013, the Department filed a petition on behalf of J.C. The Department alleged Mother and M.C. failed to protect J.C. because: (1) Mother engaged in domestic violence with M.C., which placed J.C. at risk of physical or emotional abuse; (2) Mother had a history of substance abuse, which placed J.C. at risk of abuse or neglect; (3) Mother had unsafe relationships that were physically and emotionally unhealthy; (4) Mother failed to reunify with A.P., N.P., and N.P.J.; (5) M.C. engaged in domestic violence with Mother, which placed J.C. at risk of physical or emotional abuse; (6) M.C. suffered from drug addiction, which impeded his ability to care for J.C.; and (7) M.C. had a criminal history and pattern of behavior that were not conducive to caring for a child. It was further alleged that J.C.'s half-siblings, A.P., N.P., and N.P.J., were abused or neglected by Mother thus placing J.C. at similar risk of abuse or neglect. The court found a prima facie case had been established by the Department. Judge Tavill ordered J.C. be detained in Mother's custody, but out of M.C.'s custody.

G.   TERMINATION AND REQUEST TO CHANGE A COURT ORDER

Mother continued to visit the children; however, sometimes she arrived late and the children had already left. Mother did not have a car, so she relied on Great-Grandmother and public transportation for rides. The social worker believed the three children were "neutral" on visits with Mother, in that they did not react negatively to the visits, but also did not seem upset when Mother failed to arrive at the visits. The social

9

worker believed the children enjoyed visits with Mother, "as they would with an uncle or aunt." The children's foster family hoped to adopt them. The three children had been in the same foster home for one year, ten months and appeared attached to their foster parents.

On March 7, 2013, Mother filed a request to change a court order in regard to the three older children. (§ 388.) Mother asserted circumstances had changed because (1) she had suitable housing that the Department deemed appropriate; (2) the Juvenile Court left J.C. in Mother's custody; (3) Mother tested negative for drugs for over a year; and (4) Mother completed her case plan. Mother requested the children be returned to her custody or that she be given unsupervised visits and reunification services be reinstated. Mother asserted the changes would be in the children's best interests because Mother was bonded with the children and the children could maintain ties with their biological family. The court ordered a hearing on Mother's request.

The Department opposed Mother's request. The Department asserted Great-Grandmother prepaid six months of rent for Mother's apartment and it was possible Great-Grandmother kept the key from Mother at one point "as a form of control." The Department expressed concern that Mother's use of the apartment was dependent on Great-Grandmother's feelings toward Mother "at any given time" and that the prepaid rent would run out in May 2013. The rent for the apartment was $850 per month, but with the three children Mother was only eligible for $608 per month in cash aid, along

10

with food stamps and Medi-Cal.[3] The social worker feared Mother's financial situation would not allow her to support four children.

The social worker noted Mother regularly visited the children, but that Mother appeared "tired" after the one-hour visits. The social worker feared Mother would be set-up for failure if all four children were placed in Mother's custody. The social worker asserted there were no services to assist Mother with the problems she was facing. Therefore, the Department contended the request to change a court order should be denied.

H.    JURISDICTION FOR J.C.

The Department located the police report concerning the October 16 incident. The report reflected a witness saw M.C. and an unnamed female victim, who was M.C.'s pregnant girlfriend, fighting in the street. M.C. suffered a cut on his upper lip and knuckle, while Mother suffered a cut on her upper lip and had blood on her ear. M.C. explained Mother saw him in a car with another girl, "Chrissy." Mother flagged down M.C., so he stopped the car. M.C. and Mother argued, but they denied using force against one another. M.C. was arrested for domestic violence. Mother told the social worker she was fighting with Chrissy, not M.C.

The social worker found J.C. was "adequately cared for in [Mother's] custody." Mother attended Inland Behavioral and Health Services programs Monday through

_____

[3] According to the Department's report, Mother's cash aid would be based on three children rather than four "due to her status as a 'drug felon.'"

11

Thursday from 8:00 a.m. to 1:30 p.m. Mother visited the three older children one hour per week. The social worker found Mother was doing[] positive things in her life."

Nevertheless, the social worker was concerned about Mother's history and M.C.'s behavior, although M.C. no longer lived with Mother. The social worker feared Mother might not be living "the forthright, transparent life of a person truly in recovery," which caused the social worker to have "grave concerns" about Mother. The social worker believed Mother's sobriety was "tenuous," because Mother "has no functional family and no true support system," other than the people she met at Inland Behavioral and Health Services. The social worker feared Mother would become "bored and/or stressed" caring for J.C. and then rely on people who were negative influences on Mother. The social worker speculated that Mother and M.C. could be having "clandestine visits," which caused the social worker to fear Mother would relapse into drug use or engage in another domestic violence incident. The social worker was also anxious about the possibility that Mother would not be able to afford her apartment when the prepaid rent ran out in May 2013.

    I.     <u>MAY 13, 2013, HEARING</u>

On May 13, 2013, the juvenile court held a combined hearing for (1) the termination of parental rights relating to the three older children, (2) the jurisdiction hearing for J.C., and (3) Mother's request to change a court order. The social worker testified at the hearing. The social worker did not recall being concerned about Mother not attending 12-step meetings, but noted Mother was now involved in a "rather intensive program" with meetings "every day." The social worker confirmed Mother

12

tested negative for drugs for two years; J.C. also tested negative for drugs at birth. The social worker confirmed Mother had appropriate housing. The social worker visited Mother's home "[m]any times," including late at night, but never found M.C. in the apartment.

The social worker said Mother was regularly attending visits with the three older children and doing "positive things" with J.C. The visits with the children were "pleasant," and the social worker had "no doubt that she cares for her [older] children." The social worker felt the children "enjoy[ed] spending time with their mother," but they were bonded with their foster parents and viewed the foster parents as "'Mom' and 'Dad.'" The social worker concluded Mother made "significant progress" since the detention of the three older children. Nevertheless, the social worker believed Mother's request to change a court order should be denied based upon the social worker's concerns about Mother's future. The social worker testified, "[T]he amount of work that it is to try to maintain four children is high, and I worry that it would be too difficult to do, and I think it could sink her ship, so to speak."

The Department's attorney questioned the social worker about the alleged domestic violence involving Mother and M.C. The social worker testified there was one incident in October 2012, and a second incident in the Department's parking lot in 2013, wherein there was a verbal argument. The social worker felt the two incidents showed Mother failed to benefit from the reunification services, because the two incidents and Mother's involvement with M.C. reflected poor judgment on Mother's part.

13

Mother also testified at the hearing. Mother said the three older children "run up and jump in [her] arms" at the visits, and tell her they do not want to leave when the visits end. Mother denied being in a relationship with M.C. and said she last saw him when they were at the Department's office. Mother explained that the alleged October 2012 domestic violence incident involved Mother fighting with another woman. Mother explained that "Christy" attacked Mother, so Mother defended herself. Mother denied that M.C. used physical force against her. Mother denied that an argument took place in the Department's parking lot in February 2013.

Mother stated that her prepaid rent was paid with money that her Grandfather (Great-Grandfather) left to her as well as money from Great-Grandmother. Mother said the advanced rent would run out in May 2013, but she would again use the money left by Great-Grandfather to pay six months of rent. Mother said she was receiving state assistance and looking for employment. While Mother was being questioned by minors' counsel, the following exchange took place:

"[Minors' Counsel]: Were you concerned about getting pregnant?

"[Mother]: No.

"[Minors' Counsel]: So you felt that if you got pregnant, that was—that would not interfere with the return of the other children?

"[Mother's Counsel]: Objection. Relevance.

"The Court: Overruled. [¶] Did you think getting pregnant with [J.C.] would interfere with your case plan on the other children?

14

"[Mother]: I did think about this. When I first found out I was pregnant, I was confused as far as being honest with [the social worker]. I was making a decision on what I should do, but I couldn't go forward with having an abortion.

"[Minors' Counsel]: Did you do anything to prevent yourself from getting pregnant?

"[Mother's Counsel]: Objection. Relevance.

"The Court: Sustained. It sounds to me that her pregnancy was planned from her statement."

In regard to J.C.'s jurisdiction, the juvenile court found true all the allegations in the petition; however, the court struck the language involving "domestic" violence and M.C., thus finding only that Mother engaged in violent behavior, as opposed to domestic violence involving M.C. In regard to J.C.'s disposition, the court said, "[T]he Court's intention is to keep you on family maintenance. If I had heard the [detention hearing], the child would have stayed removed, and you would have been working your plan, so you got a break. I can't believe that you have four kids and [have] yet to focus on your four kids. You seem quite happy losing children and then just having another one and lying about it and bucking the system. That's what you do."

As to the request to change a court order, the juvenile court said, "Services were terminated for the mother and [N.P.S.] in November of 2012. So when services were terminated, you would think that would change things for Mother, and quite frankly, nothing's really changed. After all is said and done, the only thing she's done is gotten a bigger apartment, which she is not paying for. Sure, she's gone to some classes, but she didn't do anything other than get somebody to pay for her apartment."

Mother informed the court that she could move out of her apartment and into a sober living facility if she needed to do that in order to retain her parental rights. The juvenile court responded, "I am not sure if that is an option if you have four kids. You have these children, and since they have been born you really have been unable to provide. It doesn't make any sense to me." The juvenile court found, "there is no significant change of circumstances, and the best interest of the children is to stay where they are ready to be possibly adopted." The court denied Mother's request to change a court order. (§ 388.)

Mother asked the juvenile court to change the social worker assigned to her case due to a personality conflict between the two. (§ 16513.5.) The court responded, "I don't need to deal with that," and moved to the issue of terminating parental rights. The court found the three older children were likely to be adopted. The court terminated the parental rights of Mother, N.P.S., and R.R.

16

## DISCUSSION

A.      SUBSTANTIAL EVIDENCE

1.      *CONTENTION*

Mother contends substantial evidence does not support the juvenile court's jurisdiction findings concerning J.C. because none of the findings were connected to a risk of harm to J.C. For example, J.C. was not present when Mother engaged in violent behavior with Christy and the violence did not occur in the home. Mother contends the court relied solely on speculation and fears about Mother's future, rather than the evidence of Mother's current situation, in rendering its findings.[4]

2.      *STANDARD OF REVIEW*

'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] . . .' [Citation.] However, substantial evidence is not synonymous with any evidence. [Citations.] . . . 'While substantial evidence may consist of

---

[4] The Department contends Mother forfeited her substantial evidence argument by conceding the substance abuse allegation in the juvenile court. We disagree that Mother forfeited the issue because, at the juvenile court, Mother asked that "her case be dismissed with regard to [J.C.]" Thus, it does not appear Mother intended to concede the issue of jurisdiction. Additionally, substantial evidence arguments are not forfeited for appeal by failing to object. (*People v. Butler* (2003) 31 Cal.4th 1119, 1126.)

17

inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)

3. *LAW*

A child comes within the juvenile court's jurisdiction when there is evidence "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b).) "'[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citations.]' [Citation.]" (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1394.) The standard of proof at a jurisdiction hearing is a preponderance of the evidence. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.)

4. *VIOLENCE*

The juvenile court's first jurisdictional finding was that Mother engaged in violent behavior that placed J.C. at substantial risk of suffering physical or emotional abuse or neglect.

The only evidence of Mother acting violently was the October 2012 incident. Mother testified that she "got into a fight" with Christy after Christy attacked Mother. As a result of the fight, Mother suffered an injury on her lip. The jurisdiction hearing

18

took place in May 2013.  J.C. had been in Mother's custody since Judge Tavill ordered J.C. returned to Mother's care in February 2013.  The social worker visited Mother's home "[m]any times," including "many" unannounced visits and visits late at night.  The social worker found J.C. was "doing well" in Mother's care.  The social worker noted that J.C. was "growing well, she is free of marks, bruises or rash, and there is apparent nurturing and bonding taking place."

Given the evidence, assuming substantial evidence supports a finding that Mother engaged in a violent altercation with a woman in October 2012, it is unclear how one could infer that J.C. is at a substantial risk of suffering physical or emotional harm due to this behavior.  There is nothing indicating Mother regularly responds to people with violence or that she is violent toward J.C.  Since there is nothing indicating a violent demeanor, regular episodes of violence on Mother's part, or more than a single episode of violence wherein Mother could have possibly been an aggressor, there is not substantial evidence of J.C. being at a substantial risk of harm.  Accordingly, we conclude the juvenile court's finding is not supported by substantial evidence due to the risk of harm element.

The Department raises the following argument:  "[The social worker] was concerned that the domestic violence incidents between [M.C.] and [Mother] indicated that [Mother] had not benefitted from services.  Domestic violence is presumptively detrimental to children."  The Department's argument is not persuasive because (1) the court did not find Mother engaged in domestic violence, it found she engaged in violent behavior, as a result we cannot assume the violence was domestic violence and

19

therefore cannot apply a presumption concerning domestic violence; and (2) the Department is relying on the social worker's anxieties about Mother's future as opposed to evidence of what actually occurred—speculation is not evidence. (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1394.)

### 5. *SUBSTANCE ABUSE*

The juvenile court's second finding was that J.C. was at substantial risk of suffering harm due to Mother's history of substance abuse. Mother has a history of abusing marijuana, alcohol, and methamphetamines. At the time of the jurisdiction hearing, Mother had tested negative for drugs for nearly two years. J.C. tested negative for drugs at birth. Given the evidence of Mother's two-year sobriety, it is pure speculation that she would relapse into drug use, thus placing J.C. at substantial risk of suffering harm. The evidence, as it stands, does not support even an inference that J.C. is at risk due to Mother's drug use because there is nothing suggesting Mother used drugs during J.C.'s life, during her pregnancy with J.C., or in the multiple months prior to her pregnancy. Accordingly, we conclude substantial evidence does not support the juvenile court's finding, due to the substantial risk element.

The Department asserts substantial evidence supports the substantial risk element because Mother relapsed in the past after going through treatment programs, the social worker "was concerned" about Mother being resistant to services, and Mother was continuing to see M.C., who used drugs. Mother testified that she was no longer in a relationship with M.C. and had last seen him at the Department office during a visit. Although the social worker visited Mother's home "[m]any times," including late at

night, she never found M.C. in the apartment. Thus, there appears to be little support for the conclusion that Mother was continuing to see M.C.

As to the social worker's concerns about Mother's resistance to services, the record reflects Mother completed her parenting classes and substance abuse treatment, participated in drug testing and 12-step meetings. At the time of the jurisdiction hearing, Mother was attending Inland Behavioral and Health Services programs Monday through Thursday from 8:00 a.m. to 1:30 p.m. Mother also participated in domestic violence classes and anger management classes, even though they were not part of her case plan. Mother explained that she took the extra classes because she wanted to "learn as much as [she] could." The foregoing evidence reflects that if Mother was resistant to services, it did not stop her from participating in the services. Given Mother's participation, especially in years of drug testing, it is unclear how one could infer this behavior caused J.C. to be at a substantial risk of harm.

In regard to Mother's prior relapse, the evidence reflects Mother has remained sober for nearly two years. The Department's assertion that Mother's prior relapse places J.C. at a substantial risk of harm is problematic because it is unclear how Mother could ever overcome the speculation that she could once again relapse. The problem we face is that inferences must be based upon the evidence. The evidence in this case is that Mother has been sober for two years and J.C. was born drug-free. While one can always speculate that Mother could relapse, there is not evidence supporting that inference. It is conjecture. One must speculate that Mother will relapse and then that Mother's relapse will be so severe it causes J.C. to be at a risk of harm. Given the

21

speculation and conjecture involved, we find the Department's argument to be unpersuasive.

### 6.    *UNSAFE RELATIONSHIPS*

The juvenile court's third jurisdictional finding was J.C. is at substantial risk of suffering harm due to Mother's "unsafe relationships and associations with people both in her home and in her environment that are physically and emotionally unhealthy." Although the allegation is vague, we infer the court's finding concerns M.C. and Great-Grandmother.

The evidence reflects Mother ended her relationship with M.C. in March 2013 when she discovered he was using drugs. Mother had last seen M.C. at the Department's office during a visit. The social worker visited Mother's home "[m]any times," including unannounced visits and visits late at night, but she never found M.C. in the apartment. Since there is no evidence of Mother being in a relationship with M.C., it is difficult, if not impossible, to infer J.C. is at a substantial risk of harm due to a relationship Mother may or may not have with M.C. Accordingly, we conclude substantial evidence does not support the juvenile court's finding due to the risk of harm factor.

In regard to Great-Grandmother, the evidence reflects Great-Grandmother may have prepaid six months of rent for Mother's apartment. Mother told a social worker that Grandmother sometimes helps her, but other times does not want to help her. Nevertheless, Mother lived in the apartment for the six-month period. The social worker heard Great-Grandmother may have kept the apartment key from Mother "as a

form of control," but the social worker never confirmed that rumor. Thus, the concrete, non-rumor evidence, reflects Great-Grandmother possibly prepaid Mother's rent for six months and Mother lived in the apartment apparently unfettered by Great-Grandmother during that time. Given the evidence, it is difficult to understand how one could infer there is an unhealthy relationship between Mother and Great-Grandmother that would cause J.C. to be at a risk of harm. It appears from the evidence that Great-Grandmother was trying to provide J.C. with a residence. Thus, we conclude substantial evidence does not support the juvenile court's finding due to the risk of harm element.

The Department asserts substantial evidence supports the juvenile court's finding concerning M.C. because Mother was a victim of M.C.'s domestic violence. The Department points to evidence of the October 2012 fight and the incident in which Great-Grandmother supposedly yelled outside of the Department's office about M.C. kicking the "dog shit" out of Mother while she was pregnant.

As set forth *ante*, focusing on the substantial risk of harm evidence—there is nothing indicating Mother was in a continuing relationship with M.C. that would place J.C. at a substantial risk of harm. Mother explained that she learned of M.C.'s drug consumption when she was confronted with his drug test results while testifying at J.C.'s detention hearing in February 2013. Mother ended the relationship with M.C. when he tested positive a second time in March 2013. Mother stopped seeing M.C. socially, only seeing him at the Department's office and court.

Thus, assuming the evidence supports a finding that Mother was a victim of domestic violence, it is difficult to infer J.C. is at a substantial risk of harm due to this

past suffering by Mother. There is no evidence indicating Mother still interacts with M.C. in an unsupervised environment. To reach the juvenile court's finding, we would have to infer Mother would see M.C. in an unsupervised location, M.C. would physically abuse Mother, and J.C. would somehow be present during that incident. The amount of attenuating inferences that needs to be made to support the court's finding push the finding into the realm of speculation and conjecture.

### 7. *OLDER SIBLINGS*

The juvenile court's fourth jurisdictional finding was that J.C. was at a substantial risk of harm because Mother failed to reunify with the three older children, and failed to benefit from the services she received during the older children's dependency case. In regard to the services, Mother participated in substance abuse classes, parenting classes, employment classes, anger management classes, domestic violence classes, and 12-step meetings. The anger management classes and domestic violence classes were not part of Mother's case plan but she took the classes in order to "learn as much [she] could." Mother referred to her October 2012 fight with Christy as "irresponsible." Mother ended her relationship with M.C. when she learned he was abusing drugs. Mother tested negative for drugs for nearly two years. Mother had J.C. in her custody since February 2013, and J.C. was "doing well in her care" according to the social worker.

Given the foregoing evidence, it would be difficult, if not impossible, to reach the conclusion that Mother failed to benefit from services. Mother maintained her sobriety, properly cared for J.C., ended a relationship due to the person's drug use, and

24

reflected upon the irresponsibility of her negative behavior. We are unable to extrapolate how one could conclude Mother failed to benefit from the services offered to her. Thus, we conclude there is not substantial evidence supporting this portion of the juvenile court's finding.

Next, we address the finding concerning Mother's failure to reunify with the three older children. The social worker believed the three older children should not be placed in Mother's custody because (1) Mother appeared tired after the one-hour visits; (2) returning all four children to Mother's care would be "setting her up for failure," because Mother has "no additional support"; (3) Mother's sobriety was "tenuous"; (4) Mother did not have the means to pay her rent on her own; and (5) Mother initially hid her pregnancy and her relationship with M.C. from the social worker, thereby causing the social worker to question if Mother was living "the forthright, transparent life of a person truly in recovery."[5]

The "tiredness" factor would not be an issue as to J.C., because Mother had managed to properly care for J.C. without being too tired to participate in all the various case plan requirements. The issue of having all four children being overwhelming for Mother is really only relevant in the case involving the three older children, as J.C.'s

---

[5] We focus on the Department's reasons for believing the three older children should not be reunited with Mother, because the juvenile court did not give detailed reasons for terminating Mother's parental rights. For example, the court said only, "Court previously made a finding denying or terminating reunification [services] for [Mother and the two fathers]. [¶] There is clear and convincing evidence that it is likely the children will be adopted. [¶] Parental rights of [Mother and the two fathers] are terminated." We infer the juvenile court relied on the Department's reasoning.

25

case only involves J.C., and Mother managed to properly care for J.C. Thus, this factor is not applicable in J.C.'s case. As set forth *ante*, Mother tested negative for drugs for two years. Thus, it is difficult to understand why her sobriety is described as tenuous.

As to Mother's rent, Mother explained that she had money left to her by Great-Grandfather, which she would use to again prepay her rent. If the court disapproved of that, then she would move into a sober living facility. The juvenile court did not believe Mother could live in a sober living facility with four children, but in this portion of the case we are only discussing a risk to J.C., so we need not be concerned about whether multiple children are accepted at sober living facilities, should the need arise for Mother to reside in such a facility—we are only concerned about one child.

The fifth concern for returning the children to Mother was that Mother had previously hidden her pregnancy and relationship with M.C. from the social worker, thus causing the social worker to question whether Mother was truly in recovery. The record reflects Mother participated in drug tests for nearly two years, the social worker made frequent visits to her home, including unannounced visits and late night visits, and Mother participated in a program that required her presence Monday through Thursday from 8:00 a.m. to 1:30 p.m.

From the evidence, it appears Mother's life was open to the Department. The Department was able to go into her home unannounced, analyze her urine for drugs, and account for her presence in classes four days per week. Mother explained that she kept the pregnancy a secret while she decided whether to abort the fetus, which appears to be

a reasonable explanation for wanting a level of privacy especially when the rest of her life and her home were readily accessible to the Department.

Further, it does not appear Mother hid the fact she spent time with M.C., since she described them as "friends." Rather, she hid the sexual aspect of their relationship. Again, it is possible Mother felt the Department would allow her privacy in this part of her life, given how open she was with the rest of her life. Mother may have been incorrect in keeping some sexual matters private from the Department, but it is difficult to understand how these decisions pose a substantial risk to J.C. Mother's choice to not initially discuss her sexual and reproductive decisions with the social worker do not equate to being a person who is not truly in recovery. Rather, it reflects a person who is perhaps uncomfortable discussing her sex life with a social worker.

In sum, the reasons for the three older children not reuniting with Mother do not appear to be things that would pose a risk of harm to J.C. As set forth *ante*, J.C. had resided with Mother since February 2013 and was doing well in her care. Thus, the speculation concerning the various things that could potentially go wrong with all four children in Mother's care is not evidence supporting a finding that J.C. comes within the juvenile court's jurisdiction.

## 8. *ABUSE OF SIBLING*

The juvenile court's fifth jurisdictional finding was that J.C.'s three older siblings were abused or neglected so J.C. was at a substantial risk of being abused or neglected given that Mother failed to benefit from services and failed to reunify with the three older children. (§ 300, subd. (j).) As explained *ante*, the evidence supports only a

finding that Mother benefitted from services.  Further, the reasons that Mother failed to reunify with the three older children, as explained *ante*, does not support the conclusion that J.C. is at risk in Mother's care.  Accordingly, for the detailed reasons set forth *ante*, we conclude substantial evidence does not support the juvenile's court's substantial risk finding.

### 9.    *CONCLUSION*

In sum, there is no substantial evidence supporting the juvenile court's finding that J.C. comes within the court's jurisdiction as that finding relates to Mother.  We will reverse the juvenile court's jurisdiction order as it relates to Mother and J.C.[6]  As a result of our conclusion, we do not address Mother's contentions concerning (1) uncorroborated hearsay, and (2) removal of the social worker because the contentions are moot.  (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1316 [an issue is moot when no effective relief can be granted].)

### 10.    *REQUEST FOR JUDICIAL NOTICE*

The Department requests this court take judicial notice of documents and records reflecting that during the pendency of this appeal (1) the Department filed a supplemental petition concerning J.C., (2) the juvenile court again found J.C. came within the court's jurisdiction, (3) the juvenile court removed J.C. from Mother's custody, and (4) a hearing about terminating Mother's parental rights to J.C. is scheduled for December 18, 2013.

---

[6] J.C.'s father, M.C., has not appealed.  Thus, the jurisdictional orders pertaining to J.C. and M.C. will not be affected by our conclusion.

28

"It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Absent exceptional circumstances, an appellate court will not accept postjudgment evidence. (*Id.* at pp. 405, 413.)

The Department asserts exceptional circumstances exist in this case because the documents (1) prove Mother, "committed perjury and violated the court orders prohibiting contact between [M.C.] and [J.C.]"; and (2) "vindicate" the juvenile court and social worker by proving Mother continued her relationship with M.C. The Department has failed to show exceptional circumstances. The documents reflect only that J.C.'s case is ongoing; like many dependency cases, a supplemental petition was filed and hearings continue to be scheduled. There are no exceptional circumstances requiring this court to sit as a trier of fact to determine if Mother committed perjury or if the social worker and juvenile court have been "vindicated" by the postjudgment evidence. We are a court of review. We are not a vindicator, and, unless exceptional circumstances require it, not a trier of fact. Accordingly, the Department's request for judicial notice is denied.

B.    REQUEST TO CHANGE A COURT ORDER

Mother contends the juvenile court erred by denying her request to change a court order because circumstances had changed dramatically and the three older children's best interests would be served by being with their biological family. (§ 388.)

29

Under section 388, a parent may petition a juvenile court to modify a previous order on the grounds of changed circumstances. (§ 388; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) The petitioner has the burden to show, by a preponderance of the evidence, a change of circumstances, and to show that the proposed modification is in the child's best interests. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; Cal. Rules of Court, rule 5.570(h)(1).) "We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. [Citations.]" (*B.D.*, at p. 1228.)

As set forth *ante*, Mother made great strides in completing her case plan, maintaining her sobriety, and providing daily care for J.C. Thus, we focus on the best interests prong, because that is the more difficult part of this analysis. The best interests analysis requires consideration of "the 'totality of the child's circumstances.' [Citation.]" (*In re Vincent M.* (2008) 161 Cal.App.4th 943, 960.)

The three older children never resided together in Mother's care, because A.P. resided with Great-Grandmother since 2007—before N.P.'s and N.P.J.'s births. The three children had been living together in their foster parents' home for approximately two years. The foster parents wanted to adopt the three children. The children ran through the foster parents' home "as if they belong there." The children refer to their foster parents as "'mom'" and "'dad.'"

The juvenile court could reasonably infer from this evidence that the three children viewed the foster parents' house as their home, and the foster parents as their parents. While the children may have been bonded to Mother, there was nothing demonstrating she was capable of caring for all four children. For example, Mother did

30

not have unsupervised overnight visits, which could help show her ability to care for multiple children at once. Rather, Mother had one-hour visits where all four children were present, and Mother appeared "tired" after the hour ended. Given that Mother did not show she could care for all four children at once, and the children appeared to have emotional bonds with the foster parents, the juvenile court could reasonably conclude it was not in the children's best interests to grant Mother's request to change a court order.

Mother points to the evidence reflecting the three older children were happy to see her at visits and did not want the visits to end. We agree the children appeared to enjoy Mother's company. However, the juvenile court could reasonably conclude the children's best interests were better served by staying in a home that they had lived in for two years, with foster parents who were bonded with the children, than by returning them to Mother's care when the three children had never before resided together in Mother's custody. Thus, while we agree there is conflicting evidence, we conclude the juvenile court's decision was within reason.

### C.   PARENT-CHILD BOND

Mother contends the juvenile court erred by terminating her parental rights because the court should have applied the parent-child bond exception to termination. (§ 366.26, subd. (c)(1)(B)(i).)

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable. (§ 366.26, subd. (c)(1).) One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact

31

with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "The benefit to the child from continuing such a relationship must . . . be such that the relationship "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" [Citation.]" (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) In other words, for the exception to apply the bond between the parent and child must be a parent-child bond, rather than the type of bond a child might have with a friendly visitor or non-parent relative, such as an aunt. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) We review the juvenile court's decision to not apply the parent-child bond exception for an abuse of discretion.**7** (*Aaliyah R.*, at p. 449.)

The record reflects Mother regularly visited the three children, although sometimes she was late due to unreliable transportation. Since Mother's visits were mostly regular, we focus on the issue of whether the three children would benefit from continuing the relationship with Mother. During the visits, the children were "neutral in their responses." The children appeared happy to see Mother, but did not become upset or disappointed when the visits ended. Given this evidence, the juvenile court could

---

**7** There appears to be a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [Fourth Dist., Div. One applied the substantial evidence standard.].) We choose to follow the precedent of *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, which explained the abuse of discretion standard is applicable because "[t]he juvenile court is determining which kind of custody is appropriate for the child[, and s]uch a decision is typically review[ed] for abuse of discretion."

reasonably conclude that Mother was more like an extended family member to the children than a parent, because the children's reactions were "neutral."

Mother points out that the children had fun playing with her during visits, they would jump into her arms, and they told Mother they did not want her to leave at the end of the visits. While Mother has aptly pointed to contradictory evidence, we are not persuaded by her argument because there is evidence in the record supporting the juvenile court's decision, in particular the social worker's observations of the children's interactions with Mother. Accordingly, we conclude the court's ruling was not an abuse of discretion.

D.    OBJECTIVITY

Mother contends Judge Kersey was not objective and should have recused herself. Specifically, Mother asserts that after Judge Kersey learned Mother was pregnant with J.C., Judge Kersey lost her ability to remain neutral, as evinced in part by the judge's comment that Mother was "quite happy losing children and then just having another one and lying about it and bucking the system."[8]

"A judge shall be disqualified if . . . [f]or any reason:  (i) The judge believes his or her recusal would further the interests of justice.  [¶]  (ii) The judge believes there is a

---

[8] The Department contends this court should strike or disregard this contention because Mother failed to provide adequate legal citations in her appellant's opening brief. The Department also asserts Mother forfeited this issue for appeal by failing to request Judge Kersey recuse herself. We agree that Mother's brief is devoid of legal citations pertaining to this issue and that the issue was not raised below. Nevertheless, we will infer Mother is relying on Civil Code of Procedure section 170.1 and address the merits of Mother's contention because it is an important issue given the juvenile court's comments in the case.

substantial doubt as to his or her capacity to be impartial. [¶] (iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A).) "As a general matter, an appellate court reviews a trial court's ruling on a recusal motion for abuse of discretion. [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 237.)

Judge Kersey made unnecessarily harsh remarks toward Mother. For example, it is disrespectful and insensitive to tell a mother who is going through the process of losing her parental rights to her three children, despite having completed all of her case plan classes and maintained her sobriety for nearly two years, that she is "quite happy losing children and then just having another one and lying about and bucking the system." Mother put forth effort to comply with the Department's and court's requirements. There is nothing suggesting Mother was argumentative with the court or somehow provoked such disdain. Judge Kersey spoke carelessly and the results were likely quite hurtful to Mother, as the words were surprising for this court to read in the record.

Nevertheless, while Judge Kersey's demeanor was unnecessarily harsh and she made mistakes concerning the jurisdictional findings relating to J.C., we do not see a lack of objectivity. For example, Judge Kersey criticized Judge Tavill's placement decision concerning J.C. At the detention hearing, Judge Tavill returned J.C. to Mother's custody after the Department removed her. At the jurisdiction hearing, Judge Kersey said, "If I had heard the case [at the detention hearing], the child would have stayed removed, and you would have been working your plan, so you got a break."

34

Despite this seemingly unnecessary remark, Judge Kersey allowed J.C. to remain in Mother's custody. Thus, while Judge Kersey made some startling comments, it does not appear the court's impartial decision making was affected, because the court still made a placement decision in Mother's favor.

## DISPOSITION

The order sustaining the petition under section 300, subdivisions (b) and (j) is reversed only as it pertains to Mother and the child, J.C.[9] In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                                                      J.

We concur:

HOLLENHORST _____
                    Acting P. J.

KING _____
                    J.

---

[9] J.C.'s father, M.C., has not appealed. Thus, the jurisdictional orders pertaining to J.C. and M.C. are not included in this disposition.